UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL*. ADVOCATES FOR BASIC LEGAL EQUALITY, INC. | Case No. 3:13 CV 704 |
| | Judge Zouhary |
| Plaintiff, | Magistrate Judge Armstrong |
| - against - | |
| U.S. BANK, N.A., | **REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | |

BUCKLEYSANDLER LLP
Andrew W. Schilling (*pro hac vice*)
Benjamin B. Klubes (*pro hac vice*)
Caitlin M. Kasmar (*pro hac vice*)
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
aschilling@buckleysandler.com
bklubes@buckleysandler.com
ckasmar@buckleysandler.com

VORYS, SATER, SEYMOUR AND PEASE LLP
William G. Porter (0017296)
William A. Sieck (0071813)
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5406
Facsimile: (614) 719-5299
wgporter@vorys.com
wasieck@vorys.com

*Counsel for Defendant*
*U.S. Bank National Association*

Defendant U.S. Bank National Association ("U.S. Bank" or the "Bank") respectfully submits this reply memorandum of law in further support of its motion to dismiss.

## ARGUMENT

### I. The Complaint Fails to Allege a False or Fraudulent Claim

In its statement of interest, the government acknowledges, as it must, that HUD pays insurance claims "upon presentment," even if the mortgagee does not comply with loss mitigation requirements. The United States of America's Statement of Interest in Response to Defendant's Motion to Dismiss ("U.S. Br.") at 6; *see also id.* at 5 ("HUD may well remit insurance benefits even where there has been a failure to engage in loss mitigation"). In fact, the government acknowledges that 24 C.F.R. § 203.500, which mandates such payment, reflects the principle that a claim for insurance is "incontestable" at the time of presentment. *Id.* at 6. Relator does not seriously disagree, nor seriously dispute, that the Bank made no express certification at the time the insurance claim was submitted. Memorandum in Opposition to Defendant's Motion to Dismiss ("Rel. Br.") at xi, xiii, & 17. In other words, the Bank's claims to HUD for insurance were not false at the time of presentment. That ends the inquiry. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) ("[N]oncompliance constitutes actionable fraud *only* when compliance is a *prerequisite* to *obtaining* payment.") (emphasis added); *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) ("The prerequisite requirement recognizes that unless the Government conditions payment on a certification of compliance, a contractor's mere request for payment does not fairly imply such certification."); *U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) (implied false certification requires that regulations expressly require compliance "in order to be paid").

Ignoring the most pertinent part of the regulation, which expressly *precludes* denial of payment of the claim based on non-compliance with loss mitigation rules, the government and relator argue that the regulations nevertheless impose a condition of "ultimate" payment (or, in the government's novel formulation, a condition of ultimate "receipt" of the money) because, *after* the claims are paid, HUD's Mortgagee Review Board ("MRB") "retains the authority" to pursue administrative sanctions against lenders who fail to engage in proper loss mitigation. U.S. Br. at 5-6; Rel. Br. at 17. It is well settled, however, that regulations authorizing after-the-fact administrative remedies for non-compliance do not impose prerequisites to payment; if anything, they impose conditions of participation. *See, e.g., U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008); *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 382-83 (5th Cir. 2003); *Mikes*, 274 F.3d at 702. Indeed, the case law is uniform that where, as here, robust administrative enforcement mechanisms exist, regulatory violations should be policed administratively by the agency, and not judicially by self-interested relators through the blunt instrument of the FCA. *See U.S. ex rel. Hobbs v. Medquest Assocs., Inc.,* 711 F.3d 707, 717 (6th Cir. 2013) (explaining that "'blunt[ness]' of the FCA's hefty fines and penalties makes them an inappropriate tool for ensuring compliance with technical and local program requirements" that may otherwise "be enforced administratively through suspension, disqualification, or other remedy"); *accord U.S. ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702-03 (4th Cir. 2014) ("The existence of these significant remedial powers of the FDA buttresses our conclusion that Congress did not intend that the FCA be used as a regulatory compliance mechanism in the absence of a false statement or fraudulent conduct directed at the federal government."). As the Fourth Circuit explained, "[w]hen an agency has broad powers to enforce its own regulations, . . . allowing FCA liability based on

regulatory noncompliance could 'short-circuit the very remedial process that the Government has established to address non-compliance with those regulations.'" *Id.*[1]

On this point, the government and relator rely heavily on the fact that the potential MRB sanctions for non-compliance with FHA loss mitigations rules include (but are not limited to) a monetary penalty that is equal to three times the amount of the insurance benefits. U.S. Br. at 5; Rel. Br. at 17. But they cite no case to explain why that would change the analysis or the result; it does not change either. In *Mikes*, for example, the available administrative sanctions for non-compliance with the regulation at issue included not only disqualification from the federal program, but also "repayment of the cost of the noncompliant service to the United States." *Mikes*, 274 F.3d at 702. Here, as in *Mikes*, the availability of a range of administrative sanctions for non-compliance, expressly including disqualification from the program, only underscores that compliance with the regulations was a condition of participation in the program, not a condition of payment of the claim.

---

[1] The government reaches the wrong conclusion because it applies the wrong analysis. According to the government, the Court should determine whether compliance with the regulations is a "condition of payment" by "look[ing] to whether the violations of the regulations were material, that is, whether they had a natural tendency to influence, or were capable of influencing, the payment or receipt of HUD mortgage insurance benefits." U.S. Br. at 3. That is not the inquiry, and the government's approach mistakenly conflates the distinct FCA elements of "materiality" and "falsity." Although some courts have suggested that falsity and materiality are related concepts, they are two *separate* elements of a False Claims Act claim; whether the regulations impose a "condition of payment" goes to the element of *falsity*, not materiality. *See Mikes*, 274 F.3d at 697 (observing that materiality and falsity are "distinct" elements); *U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, No. 11-11170-DPW, 2014 WL 1271757, at *11 (D. Mass. Mar. 26, 2014) ("the determination of materiality is distinct from that regarding whether a regulation is a condition of payment or a condition of participation"). As the Fifth Circuit has explained: "The prerequisite requirement has to do with more than just the materiality of a false certification; it ultimately has to do with whether it is fair to find a false certification or false claim for payment in the first place. . . . [W]hen payment is not conditioned on a certification of compliance, it is not fair to infer such certification from a mere request for payment." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 269 (5th Cir. 2010). The government's formulation guts that essential element of the claim, allowing liability even for claims that are entirely truthful. That is not the law.

Relator also mischaracterizes the HUD process when it suggests that a mortgagee is "automatically" subject to "mandatory" penalties whenever a mortgagee submits any claim for insurance on a loan for which loss mitigation was not performed properly. Rel. Br. at xiii, 3. That is demonstrably incorrect. When HUD reviews mortgagees for compliance,[2] it "may" resolve "minor" findings without administrative action (HUD Handbook 4060.1, Rev-2, § 8-3) or "may" refer a matter to the MRB (*id*. at § 8-4). If a finding is referred to the MRB, it "may" pursue administrative action (*id*. § 8-4), which "may" include a civil monetary penalty (among a wide range of other sanctions) (*id*. at § 8-4(C)(2)). *See also* 24 C.F.R. § 30.80(l) (listing factors considered by HUD in determining whether it would be "appropriate" to impose civil penalties for loss mitigation violation); 70 Fed. Reg. 21,572, 21,573 (Apr. 26, 2005) (remedy of treble damage penalties for loss mitigation violation determined "case by case"). With respect to the MRB process, then, the decision to pursue administrative sanctions for loss mitigation violations is clearly discretionary, not mandatory. *See* 24 C.F.R. § 30.35(a) (MRB "may" initiate civil monetary penalty action where lender "knowingly and materially" fails to follow enumerated regulations, including loss mitigation regulations). In other words, HUD may decide, in its discretion and based on its expertise and programmatic judgment, that it is not appropriate to pursue *any* administrative remedy for a particular loss mitigation failure. Congress certainly did not intend the FCA to delegate to relators the authority to police these violations, as that would allow relators to pursue treble damages when HUD itself might not.[3] *See U.S. ex rel. Swan v.*

[2] Relator is wrong when it argues that, without information from a relator like ABLE, "HUD would have no means of learning this information." Rel. Br. at x. HUD routinely reviews and monitors mortgagees for compliance with loss mitigation requirements, including through on-site reviews. HUD Handbook 4060.1, Rev-2, Sect. 8-1, 2.

[3] Notably, the treble damage penalties authorized by 24 C.F.R. § 30.35(a)(14) & (c)(2) for "fail[ing] to engage in loss mitigation as provided in 203.605" are not authorized for a violation of the face-to-face meeting requirement, which is found in 24 C.F.R. § 203.604. The face-to-

*Covenant Care, Inc.*, 279 F. Supp. 2d 1212, 1222 (E.D. Cal. 2002) ("To allow FCA suits to proceed where government payment of Medicare claims is not conditioned on perfect regulatory compliance – and where HHS may choose to waive administrative remedies, or impose a less drastic sanction than full denial of payment – would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to HHS under the Social Security Act, essentially turning a discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicare requirements.").

The Sixth Circuit's decision in *Hobbs* is instructive on all these points. In *Hobbs*, the Court held that the government failed to establish any *express* false certification because the claim form submitted to request payment contained no certification that MedQuest, a medical provider, was in compliance with the specific Medicare regulation at issue. *Hobbs*, 711 F.3d at 714-15. Although MedQuest's Enrollment Application contained a general commitment to comply with "the Medicare Laws, regulations and program instructions," it did "not contain language conditioning *payment* on compliance with any particular law or regulation." *Id.* at 715 (emphasis in original). The Court also rejected the claim under an *implied* false certification theory, finding no regulations that explicitly "forbid payment when there are regulatory violations like the ones at issue here." *Id.* at 716. Here, as in *Hobbs*, the Bank did not *expressly* certify to compliance with loss mitigation requirements at the time the claim for payment was presented. And here, as in *Hobbs*, the Bank did not *impliedly* make a false certification merely by requesting payment because the regulations governing submission and payment of claims do not make compliance a "prerequisite to the government's payment." *Id.* at 714. Because the

---

face meeting requirement is not part of loss mitigation; it is part of routine servicing. It is therefore governed by a separate regulation and occurs before the requirement to engage in loss mitigation is even triggered. *Compare* 24 C.F.R. § 203.604 (face-to-face interview requirements); *with* 24 C.F.R. § 203.605 (loss mitigation requirements).

regulations do not forbid payment when there are regulatory violations like those alleged here (and indeed expressly forbid *denial* of a claim for this reason), those regulations "do not mandate the extraordinary remedies of the FCA and are instead addressable by the administrative sanctions available." *Id.* at 713.[4]

**II. The Complaint Fails to Allege a Reverse False Claim**

Perhaps recognizing the fatal flaws in its false certification theories, relator seeks to transform those same allegations into allegations of a "reverse false claim." That provision of the FCA imposes liability when a person "knowingly" makes a false statement material to an "obligation" to pay money to the Government, or "knowingly conceals" or "knowingly and improperly avoids" such an "obligation." 31 U.S.C. § 3729(a)(1)(G). The "obligation" avoided must be "an established duty," 31 U.S.C. § 3729(b)(3), and that duty to pay must attach prior to the defendant's false statement or concealment. *See Chesbrough*, 655 F.3d at 473; *U.S. ex rel. Gale v. Omnicare, Inc.*, No. 1:10CV127, 2012 WL 4473265, at *6 (N.D. Ohio Sept. 26, 2012). Here, relator alleges (in its brief only) that the Bank "concealed facts" to avoid its "obligation" to pay a civil monetary penalty to the MRB. Rel. Br. at 18. There is neither factual nor legal support for such a claim.

First, the Complaint alleges not a single fact to suggest that the Bank "concealed"

[4] Citing *Hobbs*, relator seeks to construct a condition of payment by piecing together statutory and regulatory requirements from "multiple places." Rel. Br. at 1-4, 11. But *Hobbs* itself rejects such a "cut-and-paste" approach to establishing a condition of payment. *See Hobbs, 711 F.3d at 715* (rejecting government's "weaving together isolated phrases from several sections in the complex scheme" of regulations). In any event, none of these "multiple" sources relate to (much less impose preconditions on) the actual payment of insurance claims. While the various rules and regulations cited speak generally to the notion that lenders should comply with loss mitigation requirements before foreclosing, that at most establishes the framework for proving non-compliance; but that simply begs the question of whether payment is forbidden in the absence of compliance. That central question is directly answered, of course, by 24 C.F.R. § 203.500's unambiguous command that HUD "shall not" deny insurance benefits because of such non-compliance.

anything. In fact, other than in the rote recitation of the elements of the claim, the word "conceal" does not even appear in the Complaint. That alone warrants dismissal. *See, e.g.*, *U.S. ex rel. Schaengold v. Memorial Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *15 (S.D. Ga. Dec. 8, 2014) ("[A] lone, conclusory allegation of concealment of an obligation to pay money to the Government would be insufficient to survive a motion to dismiss."). Second, even if relator had alleged sufficient factual support, the claim has no legal basis because the Bank had no "established duty," at the time it made any express certification or submitted any claim, to pay a civil penalty to HUD. The mere potential that the defendant could be found liable to repay the claim, or to pay a monetary penalty, is not an "obligation" for FCA purposes. *See Chesbrough*, 655 F.3d at 473 ("merely alleg[ing] that [defendant] is obligated to repay all payments it received from the government" insufficient to state reverse false claim); *U.S. ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 49 (D. Mass. 2014) ("The mere fact that [conduct] *might* result in a fine or penalty is insufficient to establish an obligation to pay the government under § 3729(a)(1)(G).") (emphasis in original, internal quotations omitted); *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) ("[T]he reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) . . . .") (emphasis in original); *Schaengold*, 2014 WL 6908856, at *17 ("[T]he type of contingent liability that courts have excepted from the scope of reverse false claims liability is liability which 'attach[es] only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties.'"). Accordingly, the claim is meritless.

### III. The Complaint Fails to Allege Knowledge

As evidence of the Bank's "knowledge" of the alleged "fraud," relator points to nothing other than the text of the Bank's annual certification. Rel. Br. at 21. Because a Bank vice

president signed the form, the argument proceeds, "she must have known" that the Bank was not in compliance. Rel. Br. at 21. But "must have known" is not enough. *See U.S. ex rel. Colucci v. Beth Israel Medical Center*, 785 F. Supp. 2d 303, 317 (S.D.N.Y. 2011) (allegations that officials familiar with hospital accounts and financial statements "must have known" they were submitting false claims insufficient to allege "knowledge"); *cf.*, *Maldonado v. Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998) ("[T]he pleading of scienter may not rest on a bare inference that a defendant 'must have had' knowledge of the facts.") (internal quotation marks omitted). Further, the mere fact that a Bank official signed a certification attesting to *compliance* does not plausibly support an inference that the official knew that the Bank was *not* in compliance. Nor could it plausibly be inferred that the Bank knew specifically that it had foreclosed improperly on the three Ohio borrowers, let alone that the Bank knew it had not complied with the regulations when it submitted insurance claims to HUD on those loans. Indeed, the Complaint does not allege anything about the very claims to HUD that form the basis of this case (other than the date submitted), and it certainly does not allege that the unidentified person who submitted them knew they were false. Accordingly, the Complaint is deficient on this essential element.

**IV. The Public Disclosure Bar Precludes this Action[5]**

Finally, relator argues that none of the disclosures identified by the Bank "disclose any sort of fraud at all." Rel. Br. at 22. But the same may be said of relator's Complaint: It does not allege a particular fraud at all; it merely alleges that the Bank failed to engage in appropriate loss mitigation with respect to three Ohio borrowers, and that the Bank sought payment of insurance claims by HUD. Certainly the Bank cannot be faulted for failing to identify a public disclosure

[5] The Court may not dismiss an action under the public disclosure bar when the government intervenes or objects. *See* 31 U.S.C. § 3730(e)(4)(A). Here, the government has neither intervened in the case nor objected to dismissal on public disclosure grounds.

of a specific fraudulent scheme when the Complaint itself fails to allege a specific fraudulent scheme.

What little the Complaint does allege, however, was publicly disclosed. To determine whether relator's allegations have been publicly disclosed, the Court considers whether the prior disclosures "revealed the same kind of fraudulent activity against the government as alleged by the relator." *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009). Here, it had been widely reported, in the press and in federal reports,[6] that the Bank (and other lenders) had been accused publicly, and long before this suit was filed, of failing to engage in proper loss mitigation and servicing. And it is obviously known to HUD that the Bank has long been an FHA-approved lender, and therefore has made claims to HUD over the years. The Complaint adds no additional, material facts to the public record. While relator provides three examples of borrowers who were allegedly denied proper loss mitigation, every allegation of relator's Complaint need not have been publicly disclosed for the action to be barred; it is enough that the "primary focus" of relator's Complaint has been publicly disclosed. *See, e.g.*, *Poteet*, 552 F.3d at 514 (relator's addition of new "major allegation" insufficient when "primary focus" of the complaint is the same). Here, the "primary focus" of the Complaint is alleged loss mitigation and servicing failures. Indeed, if it were sufficient for a relator to allege a handful of examples of otherwise publicly disclosed loss mitigation deficiencies, then nothing would prevent this relator or any other from filing identical FCA suits against every other FHA lender that was ever

[6] Relator argues that, under the FCA as amended, filings in *state* court lawsuits are insufficient. Rel. Br. at 24. Putting aside that relator's argument ignores the cited *federal* reports about U.S. Bank's loss mitigation deficiencies, such state court filings were "clearly" contemplated as public disclosures under the pre-2010 version of the FCA, *Poteet*, 552 F.3d at 513, and that version applies to all conduct occurring before the FCA was amended effective March 23, 2010. *See, e.g.*, *United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 856 (E.D. Tenn. 2013).

accused publicly of loss mitigation failures. *Id.*[7] But such actions would constitute precisely the type of parasitic action that Congress intended the public disclosure bar to preclude.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Respectfully submitted,

BUCKLEYSANDLER LLP

/s/ Andrew W. Schilling by /s/ William A. Sieck

Andrew W. Schilling (*pro hac vice*)
Benjamin B. Klubes (*pro hac vice*)
Caitlin M. Kasmar (*pro hac vice*)
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
aschilling@buckleysandler.com
bklubes@buckleysandler.com
ckasmar@buckleysandler.com

VORYS, SATER, SEYMOUR AND PEASE LLP
William G. Porter (0017296)
William A. Sieck (0071813)
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5406
Facsimile: (614) 719-5299
wgporter@vorys.com
wasieck@vorys.com

*Counsel for Defendant*
*U.S. Bank National Association*

[7] Because the particular circumstances of those three borrowers do not "materially" add to the public record, relator does not qualify as an "original source," even under the current, arguably more generous version of the public disclosure bar. In any event, relator certainly would not qualify under the pre-2010 version of this provision, which required that relators demonstrate not only "independent" but also "direct" knowledge of the fraud. *See U.S. ex rel. Ellis v. City of Minneapolis*, Civil Action No. 11-cv-00416 (PJS/TNL), 2014 WL 3928524 at *4-10 (D. Minn. July 24, 2014) (requiring direct knowledge as regarding the pre-2010 allegations). Relator certainly has no "direct" knowledge of anything the Bank did or did not do, and for that reason the claims prior to the effective date of the 2010 amendments would fail even if relator had added "materially" to the record.

**LOCAL RULE 7.1(f) CERTIFICATION**

I certify that this case has been designated for the Complex Track (Doc. 21 ¶ 3) and that the foregoing Memorandum adheres to the page limitations set forth in the Court's December 23, 2014 Case Management Order (Doc. 21 ¶ 9(c)).

/s/ William A. Sieck
VORYS, SATER, SEYMOUR AND PEASE LLP
William G. Porter (0017296)
William A. Sieck (0071813)
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5406
Facsimile: (614) 719-5299
wgporter@vorys.com
wasieck@vorys.com

*Counsel for Defendant*
*U.S. Bank National Association*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document has been filed electronically and served upon all parties of record registered through the court's electronic service system this 10th day of February, 2015.

/s/ William A. Sieck
VORYS, SATER, SEYMOUR AND PEASE LLP
William G. Porter (0017296)
William A. Sieck (0071813)
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5406
Facsimile: (614) 719-5299
wgporter@vorys.com
wasieck@vorys.com

*Counsel for Defendant*
*U.S. Bank National Association*